# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-2283

SANDRA KIDDY-BROWN,

*Plaintiff-Appellee,*

*v.*

ROD BLAGOJEVICH, individually and as
Governor of the State of Illinois,
ROGER E. WALKER, JR., individually and
as Director of the Illinois Department of
Corrections, JULIE CURRY, individually
and as Deputy Chief of Staff to the
Governor of the State of Illinois, et al.,

*Defendants-Appellants.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 04 C 1293—**David H. Coar**, *Judge.*

_____

ARGUED DECEMBER 2, 2004—DECIDED MAY 13, 2005

_____

Before COFFEY, RIPPLE and MANION, *Circuit Judges.*

RIPPLE, *Circuit Judge.* After her employment as warden at
an Illinois state prison was terminated, Sandra Kiddy-
Brown brought this action against several Illinois state

officials. She asserted claims based on 42 U.S.C. § 1983, alleging that her rights under the First and Fourteenth Amendments to the Constitution had been violated. The defendants moved for judgment on the pleadings and asserted a qualified immunity defense with respect to each of Ms. Kiddy-Brown's claims. The district court denied the defendants' motion for judgment on the pleadings and denied them a qualified immunity defense. The defendants then appealed to this court. For the reasons set forth in this opinion, we now affirm in part and reverse in part the judgment of the district court, and we remand the case for further proceedings.

# I

# BACKGROUND

## A. Facts

Prior to her termination in December 2003, Ms. Kiddy-Brown had been employed by the Illinois Department of Corrections ("IDOC") for more than nineteen years. During her employment, she had occupied various positions within IDOC: clerk, residence counselor, correctional counselor, center supervisor, coordinator and assistant warden. Most recently, Ms. Kiddy-Brown had held the position of warden at the Decatur Correctional Center ("DCC"), a position to which she was promoted in August 2001. From the time Ms. Kiddy-Brown's employment with IDOC began until 2003, the State of Illinois had been led by governors who were members of the Republican party. In January 2003, Rod Blagojevich, a Democrat, was inaugurated as Governor of the State of Illinois.

## B. District Court Proceedings

### 1.

Ms. Kiddy-Brown's original complaint was filed on February 19, 2004. On March 15, 2004, Ms. Kiddy-Brown filed a first amended complaint. The first amended complaint named as defendants Governor Rod Blagojevich, individually and as Governor of the State of Illinois, Roger Walker, Jr., individually and as Director of IDOC, Julie Curry, individually and as Deputy Chief of Staff to the Governor of the State of Illinois, and Debbie Denning, individually and as Deputy Director of IDOC (collectively, "the State defendants").[1]

The amended complaint alleged five counts; three of these counts are at issue in this appeal. Count I claimed that the State defendants had engaged in politically-motivated patronage dismissal of Ms. Kiddy-Brown in violation of the First Amendment. Count II asserted that the State defendants terminated, in violation of the First Amendment, Ms. Kiddy-Brown's employment in retaliation for her speech on matters of public concern. This count alleged that she spoke out on several matters, "including violations by State of Illinois employees of federal and state requirements for filling employment vacancies within IDOC[,] . . . the unwillingness of Defendants BLAGOJEVICH and WALKER to staff IDOC facilities at appropriate levels[,] . . . the safety of IDOC facilities[,] . . . [and] reorganization of IDOC." R.6

---

[1] The amended complaint also named as defendants Council 31 of the American Federation of State, County and Municipal Employees ("AFSCME"), Henry Bayer, individually and as Executive Director of Council 31 of AFSCME, and Buddy Maupin, individually and as Regional Director of Council 31 of AFSCME (collectively, "the AFSCME defendants").

at 8, ¶¶ 53-58. Count III alleged that defendants Blagojevich and Walker had violated Ms. Kiddy-Brown's right to due process of law under the Fourteenth Amendment to the federal Constitution by depriving Ms. Kiddy-Brown of a property interest in continued employment.[2]

---

[2] Count IV of Ms. Kiddy-Brown's amended complaint alleged that the State defendants had conspired with two of the AFSCME defendants to terminate Ms. Kiddy-Brown's employment because she "was a black woman that was affiliated with the Republican administration and because [she] was a black woman that lacked Democratic political sponsorship of Defendant [AFSCME]." R.6 at 13, ¶ 93. Count V alleged, pursuant to 42 U.S.C. § 1986, that Governor Blagojevich had actual knowledge of the conspiracy alleged in Count IV, that he had the ability and authority to prevent that conspiracy and that he did nothing to prevent that conspiracy. Counts IV and V also identify a person named "OLIVER" as a member of the conspiracy to deprive Ms. Kiddy-Brown of her constitutional rights. *See, e.g.*, R.6 at 13, ¶ 93. Ms. Kiddy-Brown's original complaint had named Ian Oliver, Chief of Operations of the Illinois Department of Corrections and President of the Greater Illinois Chapter of the National Association of Blacks in Criminal Justice, as a defendant.

On March 16, 2004, the AFSCME defendants filed a motion to dismiss Ms. Kiddy-Brown's complaint, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), for lack of subject matter jurisdiction and for failure to state a claim. The district court dismissed this motion on March 30, 2004, when the movants failed to appear and present the motion. On April 28, 2004, the AFSCME defendants again filed a motion to dismiss, pursuant to Rule 12(b)(6), for failure to state a claim. The district court deemed the AFSCME defendants' motion to dismiss a motion for a more definite statement and granted the motion. On May 20, 2004, Ms. Kiddy-Brown filed a notice to dismiss the AFSCME defendants as parties. The district court dismissed and terminated the AFSCME

(continued...)

On April 28, 2004, the State defendants filed a motion for judgment on the pleadings. *See* Fed. R. Civ. P. 12(c). They contended that they were entitled to replace Ms. Kiddy-Brown as warden at DCC with "a political loyalist" because the express written duties of the position included "substantial policy functions." R.14 at 2. The State defendants asserted that, with respect to Count I, the political patronage claim, even assuming the truth of Ms. Kiddy-Brown's allegations, they were entitled to consider political affiliation when terminating her employment. With respect to Count II, the retaliation claim, they contended that they were entitled to judgment because Ms. Kiddy-Brown was "a confidential policy-maker [who] allegedly openly criticized the State Officials and their policies," and, thus, they properly had terminated her employment after the alleged criticisms. R.14 at 2. With respect to Count III, the due process claim, they submitted that they were entitled to judgment because Ms. Kiddy-Brown did not have a protected property interest in continued employment as the warden at DCC. The State defendants also contended that they were entitled to qualified immunity with respect to each of Ms. Kiddy-Brown's claims.

### 2.

The district court denied the State defendants' motion for judgment on the pleadings. With respect to the claim of political patronage dismissal, the district court reviewed the

---

[2] (...continued)
defendants as party defendants on May 24, 2004. Also on May 24, 2004, Ms. Kiddy-Brown filed a motion to dismiss without prejudice Counts IV and V of the first amended complaint. The district court granted this motion on May 25, 2004.

description of the warden position at DCC that had been developed by the Illinois Department of Central Management Services ("CMS position description") and noted that aspects of that description resembled the description of a position for which this court had found political affiliation was an appropriate requirement. *See Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 757-58 (7th Cir. 2002).[3] The district court also observed, however, that this court has cautioned against making generalizations, based on job descriptions, about the appropriateness of political affiliation as a requirement for a particular employment position. *See Meeks v. Grimes*, 779 F.2d 417, 420 (7th Cir. 1985). Therefore, the district court determined that, at the pleadings stage of the proceedings, there simply was not enough information to determine whether the warden

---

[3] In *Thompson v. Illinois Department of Professional Regulation*, 300 F.3d 750 (7th Cir. 2002), this court affirmed the dismissal of a suit brought by a plaintiff who claimed that he had been removed from his position as Chief Administrative Law Judge ("ALJ") within the Illinois Department of Professional Regulation ("IDPR") for exercising his First Amendment rights of speech and political association. *Thompson* instructed courts to "look at the nature of the responsibilities and focus on the duties inherent in an office, and not the functions of the position performed by a particular person" when determining whether an employee was in a policymaking position for which political affiliation was an appropriate requirement. *Id.* at 756. This court examined a job description which the plaintiff had attached to his complaint and, noting that the plaintiff had presented no conflicting allegations to contradict the job description, determined that the Chief ALJ position had policymaking duties. *See id.* at 757. Therefore, the court concluded that the plaintiff did not have a First Amendment claim that he was dismissed for political reasons because a government employer is entitled to require political loyalty from employees in policymaking positions. *See id.* at 758.

position at DCC was a position for which political affiliation was an appropriate requirement.

The district court then turned to Count II, which alleged that the State defendants had terminated Ms. Kiddy-Brown's employment in retaliation for her speech on matters of public concern. The district court determined that, because the record did not permit a conclusion that the warden of DCC was a policymaking employee, Ms. Kiddy-Brown had stated a claim upon which relief could be granted. Therefore, the district court denied the State defendants judgment on Count II.

The district court then addressed Count III, which alleged a violation of Ms. Kiddy-Brown's due process rights when her employment as warden was terminated without an opportunity to be heard. The State defendants had argued that Ms. Kiddy-Brown had no protected property interest in continued employment. However, the district court observed that the arguments in support of the State defendants' position required the court to assume facts beyond those alleged in the pleadings in order to analyze promises which Ms. Kiddy-Brown claimed had been made by Governor Blagojevich. The court determined that, construing the facts alleged in Ms. Kiddy-Brown's complaint in the light most favorable to her, the first amended complaint stated a claim for relief. Therefore, the district court denied the State defendants judgment as to Count III.

The district court also denied the State defendants the defense of qualified immunity. Taking as true Ms. Kiddy-Brown's allegations that she had no close contact with IDOC policymakers, no autonomous or discretionary authority and no participation in policymaking, the district court determined that Ms. Kiddy-Brown was protected from patronage dismissal based on the law of the Seventh Circuit which was clearly established at the time Ms. Kiddy-Brown's employ-

ment was terminated. On this basis, the district court denied the State defendants qualified immunity as to Counts I and II of Ms. Kiddy-Brown's amended complaint.[4]

With respect to Count III, Ms. Kiddy-Brown's due process claim, the district court observed that clearly-established law gave Ms. Kiddy-Brown "a constitutional right to continued employment in the face of an inappropriate patronage dismissal." R.35 at 13. The court reasoned that, whether or not Ms. Kiddy-Brown had a right to continued employment, it still "would be a due process violation to terminate Kiddy-Brown for reasons of political patronage, if she is the type of employee for which patronage dismissals are forbidden." R.35 at 13. Thus, construing all allegations in Ms. Kiddy-Brown's favor, the district court determined that the State defendants were not entitled to qualified immunity as to Count III of Ms. Kiddy-Brown's amended complaint.

# II

## ANALYSIS

### A. Qualified Immunity Standards

Government officials performing discretionary functions are entitled to qualified immunity from suit "as long as their

---

[4] The district court's exact language stated that "qualified immunity is not a bar to Counts II and III of Plaintiff's Amended Complaint." R.35 at 13. We are convinced, for several reasons, that the district court in fact meant to state that the State defendants could not assert qualified immunity as a defense to *Counts I and II* of Ms. Kiddy-Brown's amended complaint: (1) the district court had determined in the paragraph immediately preceding this sentence that the warden position at DCC was protected from patronage firings; (2) it did not discuss Count I anywhere else in the section of its memorandum opinion devoted to qualified immunity; and (3) it turned next to Count III.

actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The issue of qualified immunity is to be resolved at the earliest stages of litigation. *See Delgado v. Jones*, 282 F.3d 511, 515 (7th Cir. 2002) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982)).

Although the district court's denial of the State defendants' motion for judgment on the pleadings did not put an end to this case in the district court, this court nonetheless has jurisdiction to review the limited question of whether the district court properly denied judgment on the pleadings on qualified immunity grounds. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Id.* On the other hand, this court may not reconsider the district court's determination that certain genuine issues of fact exist; such determinations are unappealable because they are not "final decisions" within the meaning of 28 U.S.C. § 1291. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995). This court may review whether the district court correctly decided any questions of law that it considered. *See Mitchell*, 472 U.S. at 528.

Our review of the denial of qualified immunity, made in the context of a motion for judgment on the pleadings, focuses on two conditions, both of which must be satisfied in order for a plaintiff to defeat a qualified immunity defense: (1) "the complaint must adequately allege facts that, if true, would constitute a violation of a constitutional right," and (2) "the case law must be 'clearly established' at the time of the alleged violation, so that a reasonable public official would have know[n] that his conduct was unlawful." *Delgado*, 282 F.3d at 515-16. The burden is on the plaintiff

to prove that a right was clearly established at the time of the conduct at issue. *Davis v. Scherer*, 468 U.S. 183, 197 (1984). "To prove the presence of a clearly established constitutional right, the plaintiff must point to closely analogous cases decided prior to the defendants' challenged actions." *Upton v. Thompson*, 930 F.2d 1209, 1212 (7th Cir. 1991) (internal quotations omitted).

Thus, according to the established framework for qualified immunity inquiries, we shall begin by asking whether, taking all Ms. Kiddy-Brown's allegations to be true, she has established that her constitutional rights were violated. If she has not alleged facts sufficient to establish a constitutional violation, then the State defendants will be entitled to qualified immunity. On the other hand, if we find that Ms. Kiddy-Brown's allegations do state a violation of constitutional law, then we shall be required to consider whether the law was clearly established such that the State defendants should have known that their actions violated the Constitution.

### B. Count I: Patronage Dismissal

We turn first to the State defendants' contention that they are entitled to a qualified immunity defense against Ms. Kiddy-Brown's claim that she was subject to improper patronage dismissal. The State defendants submit that Ms. Kiddy-Brown has not alleged a constitutional violation. They contend that the warden at DCC is required to "*make actual policy*," to implement policies and to provide "meaningful input" into the decisions of other policymakers, Appellants' Br. at 22 (emphasis in original), thus making political affiliation an "appropriate requirement" for the position. *Branti v. Finkel*, 445 U.S. 507, 518 (1980). In particular, they urge that we consider the CMS position description,

which the State defendants attached to their answer. R.9, Ex.A at 1-2.[5] In the alternative, they claim that it was not clearly established, at the time that Ms. Kiddy-Brown's employment was terminated, that subjecting her to patronage dismissal would violate the law.

### 1.

Employing the established two-step inquiry to determine whether the defense of qualified immunity has been established, we begin by asking whether Ms. Kiddy-Brown has alleged facts which, if true, constitute a violation of a constitutional right. Ms. Kiddy-Brown's claim for patronage dismissal in violation of the First Amendment is premised on the idea that "the First Amendment forbids government officials to discharge or threaten to discharge public em-

---

[5] According to the position description supplied by the Illinois Department of Central Management Services ("CMS position description"), R.9, Ex.A at 1-2, the warden at DCC "administers and directs the overall operations, programs and activities of [DCC]; formulates policy, procedures, rules, regulations and institutional directives for employees and inmates; directs, assigns, [and] evaluates work activities and areas of responsibility for all department heads; [and] plans and approves facility's fiscal budget." R.9, Ex.A at 1. The CMS position description also breaks down the warden's duties by describing particular functions of the warden position and identifying the percentage of the warden's time which should be spent on each function. For instance, according to the CMS position description, the largest block of the warden's time (35 percent) is spent "[f]ormulat[ing] and implement[ing] rules, . . . policies and procedures governing employees and inmates; plan[ning] and direct[ing] overall operations . . .; direct[ing] pivotal employees . . .; [and] appl[ying] preventive security measures enforcing policy . . . ." *Id.*

ployees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 64 (1990). "To prevail [on a claim of patronage dismissal], . . . public employees need show only that they were discharged because they were not affiliated with or sponsored by" a certain political party. *Id.* at 71 (citing *Branti*, 445 U.S. at 517).

The Supreme Court has recognized that "party affiliation may be an acceptable requirement for some types of government employment." *Branti*, 445 U.S. at 517; *see also Elrod v. Burns*, 427 U.S. 347, 360 (1976) (plurality opinion) ("Although the practice of patronage dismissals clearly infringes First Amendment interests, . . . the prohibition on encroachment of First Amendment interests is not an absolute."). Ultimately, a defendant bears the burden of establishing that a plaintiff's position falls within the exception to the general prohibition on patronage dismissal. *See Milazzo v. O'Connell* (*Milazzo I*), 108 F.3d 129, 132 (7th Cir. 1997).[6]

The Supreme Court initially framed the inquiry whether political affiliation is an appropriate requirement for employment in terms of whether a particular position involves confidential and policymaking responsibilities. *See, e.g.,*

---

[6] *See also Matlock v. Barnes*, 932 F.2d 658, 663 (7th Cir. 1991) ("In political patronage cases, defendants bear the burden of establishing that political affiliation is an appropriate qualification for the job from which plaintiff is ousted."); *Grossart v. Dinaso*, 758 F.2d 1221, 1226 (7th Cir. 1985) ("It should be stressed that the [government defendant] carries the burden [to show discharged employee was a policymaker], inasmuch as the policymaker exception constitutes a legitimate government interest that overrides the infringement of fundamental first and fourteenth amendment rights.").

*Elrod*, 427 U.S. at 375 (Stewart, J., concurring in judgment); *see also id.* at 367 (plurality opinion). However, the Court has since recognized that "[u]nder some circumstances, a position may be [one in which political affiliation is a legitimate factor to be considered] even though it is neither confidential nor policymaking in character," and that "party affiliation is not necessarily relevant to every policymaking or confidential position." *Branti*, 445 U.S. at 518. In short, "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.*

Even though *Branti* established this "broad[ ]" line of inquiry in political discharge cases, *Soderbeck v. Burnett County, Wisconsin*, 752 F.2d 285, 288 (7th Cir.), *cert. denied*, 471 U.S. 1117 (1985), this court has recognized that the terms " '[p]olicymaking' and 'confidential' do accurately describe the vast majority of offices that fall within the realm of legitimate patronage under the *Branti* formulation," *Meeks*, 779 F.2d at 420. The State defendants contend that the warden position at issue here involved policymaking. Thus, we begin our inquiry into whether this exception to the First Amendment's prohibition on patronage dismissals applies by looking for "policymaking powers." *Thompson*, 300 F.3d at 756.

The test for whether a position involves policymaking is "whether the position authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981), *cert. denied*, 455 U.S. 1021 (1982). To make this determination, we must "examin[e] . . . the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office."

*Tomczack v. City of Chicago*, 765 F.2d 633, 640 (7th Cir.), *cert. denied*, 474 U.S. 946 (1985). Therefore, even "if an office-holder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance." *Id.* at 641. From this court's cases, it is clear that the question whether an employee has policymaking powers "in many cases presents a difficult factual question." *Nekolny*, 653 F.2d at 1169; *see also Meeks*, 779 F.2d at 419-20 (describing *Branti*, 445 U.S. at 518, as mandating "a more functional analysis" of whether a particular employee is protected by patronage dismissal).

Because this case is before us on a motion for judgment on the pleadings, we must view all allegations in the pleadings in the light most favorable to Ms. Kiddy-Brown. *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995). According to Ms. Kiddy-Brown, her "duties and responsibilities as Warden were . . . of limited scope." R.6 at 3, ¶ 14. For instance, she "had no autonomous or discretionary authority"; she "did not participate in determining policy which fixed objectives"; she "did not act authoritatively on any policy-making issue impacting the State . . . or IDOC"; and her "responsibilities were tightly constrained by . . . statutes, regulations and rules." R.6 at 5-6, ¶¶ 30-37. Furthermore, according to Ms. Kiddy-Brown, the State defendants knew of her "political affiliation with the Republican administration and her lack of Democratic political sponsorship" and were motivated to terminate her employment because she was not "a political ally of the Democratic administration." R.6 at 4, ¶¶ 22-24. In fact, she alleges that she "was informed that she was being terminated because of her affiliation with the Republican administration." R.6 at 5, ¶ 27.

Based on these allegations in the complaint, we must conclude that Ms. Kiddy-Brown has alleged facts that, if true, would demonstrate the violation of a constitutional right. *See Rutan*, 497 U.S. at 71. We also must conclude that, at this very early stage of the litigation, the State defendants have not shown that the warden position at DCC is exempt from the general prohibition on political patronage dismissals. *See Milazzo*, 108 F.3d at 132. We simply are not presented with evidence sufficient to allow us to conclude that the warden position involved the kind of policymaking duties that would make political affiliation an appropriate requirement for the position.

### 2.

"After establishing that the plaintiff has adequately alleged a violation of a constitutional right, the second . . . inquiry in a qualified immunity analysis involves whether the law was 'clearly established' at the time of the alleged violation." *Delgado*, 282 F.3d at 520. Ms. Kiddy-Brown bears the burden of showing that the right in question was clearly established. *See Lunini v. Grayeb*, 395 F.3d 761, 769 (7th Cir. 2005).

The State defendants contend that it was not clearly established at the time Ms. Kiddy-Brown's employment was terminated that dismissing the warden at a state prison would violate the Constitution. They submit that "there are no closely analogous cases . . . involving the position at issue—Warden of a state correctional institution." Appellants' Br. at 28. However, the law of qualified immunity does not require a plaintiff to produce a case that is "directly on point" in order to show that a right is clearly established. *Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996). "The question is

whether a reasonable state actor would have known that his actions, viewed in the light of the law at the time, were unlawful." *Id.*

As we noted earlier, because this case is before us on a motion for judgment on the pleadings, we are obliged—as was the district court—to view the facts alleged in Ms. Kiddy-Brown's complaint in the light most favorable to her. *See Flenner v. Sheahan*, 107 F.3d 459, 465 (7th Cir. 1997). According to Ms. Kiddy-Brown, she had no "discretionary policymaking powers" and "no meaningful input into government decision making on issues where there was room for principled disagreement on goals." R.6 at 5-6, ¶¶ 34, 37. Accepting these allegations as true, Ms. Kiddy-Brown was among the employees who have a right not to be subjected to patronage dismissal.

We think the law was sufficiently clear at the time Ms. Kiddy-Brown was dismissed that a reasonable official would have understood that political affiliation was not an appropriate requirement for a position such as the one described in Ms. Kiddy-Brown's complaint. It long has been clear that the First Amendment forbids politically-motivated patronage dismissals of certain employees. *See Flenner*, 107 F.3d at 462; *Mitchell v. Randolph*, 215 F.3d 753, 757 (7th Cir. 2000); *see also Elrod*, 427 U.S. 347. This court has held clearly that political affiliation is a legitimate criterion for government employment only for those positions that "authorize[ ], either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny*, 653 F.2d at 1170; *see also Meeks*, 779 F.2d at 420.

This court already has rejected the position that there must be a case involving the position at issue in order to defeat qualified immunity. In *Flenner*, we observed that,

"[a]s early as 1975, this court rejected the notion that labels or job titles are relevant to the inquiry whether patronage dismissal is permissible," and that, "as of 1993, the law was clear that the permissibility of dismissing an employee for patronage reasons was determined by reference to the inherent powers of the particular office, not to the title of that office." 107 F.3d at 463-64. Thus, we must conclude that, by 2003, it was well-established that the First Amendment prohibits a state official from dismissing, on political grounds, an employee who was not charged with policymaking duties.

The truth of Ms. Kiddy-Brown's factual allegations regarding the duties inherent in the warden position must be resolved by the district court on a more complete record. Once the record is developed, the district court may be asked to revisit the issue of qualified immunity. *See Flenner*, 107 F.3d at 465. However, at this stage in the proceedings, we must conclude that the law on this point was clearly established when Ms. Kiddy-Brown's employment was terminated in late 2003. Therefore, we affirm the district court's denial of qualified immunity to the State defendants with respect to Count I of Ms. Kiddy-Brown's amended complaint.

### C. Count II: Retaliation

The State defendants also contend that they are entitled to a qualified immunity defense against Ms. Kiddy-Brown's claim that they retaliated against her for speaking out on matters of public concern. They submit that the First Amendment does not prohibit dismissing an employee with policymaking power who publicly criticizes her superiors. The State defendants assert that Ms. Kiddy-Brown was a policymaking employee and, therefore, that they did not act unconstitutionally in terminating her employment after she engaged in speech which she admits criticized the State defendants and IDOC policies. In particular, the State defendants contend

that the analysis outlined in *Pickering v. Board of Education*, 391 U.S. 563 (1968), does not apply to this case because Ms. Kiddy-Brown was a policymaking employee. In the alternative, the State defendants claim that the law on this question was not clearly established.

### 1.

Employing once again the two-step inquiry with respect to the qualified immunity defense, Ms. Kiddy-Brown first must allege facts which, if true, would demonstrate the violation of a constitutional right. "[T]he government cannot retaliate against its employees for engaging in constitutionally protected speech." *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 970 (7th Cir. 2001). In order to establish a First Amendment retaliation claim, a plaintiff must show (1) that she engaged in constitutionally-protected speech and (2) that her speech was "a substantial or motivating factor in the defendants' challenged actions." *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. 37*, 260 F.3d 602, 618 (7th Cir. 2001). The government bears the burden of justifying the employee's discharge. *Caruso v. De Luca*, 81 F.3d 666, 670 (7th Cir. 1996); *see also Connick v. Myers*, 461 U.S. 138, 150 (1983).

Generally, if a public employee's speech was on a matter of public concern, "[the speech] is protected if her interest in that expression outweighs the State's interest in promoting the efficiency of its public services." *Caruso*, 81 F.3d at 670. It is axiomatic in First Amendment jurisprudence that "a public employee does not shed [her] First Amendment rights at the steps of the government building." *Vargas-Harrison*, 272 F.3d at 970; *see also Connick*, 461 U.S. at 142 ("[A] State cannot condition public employment on a basis that infringes [an] employee's constitutionally protected interest in freedom of expression."). However, the First Amendment's

protection of public employee speech is not absolute, because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568. Thus, courts faced with a public employee's First Amendment retaliation claim must balance "the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*[7]

However, relying in part on cases concerning political patronage, this court has determined that, in cases involving the dismissal of an employee in a policymaking position, "there is no need for a fact-specific analysis of the circum-

---

[7] This court, applying the balancing test from *Pickering v. Board of Education*, 391 U.S. 563 (1968), has identified seven circumstance-specific factors which should be taken into consideration in the determination of whether the government's interest sufficiently outweighs an employee's First Amendment interests. *See, e.g.*, *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492 (7th Cir. 1994). The seven factors to be balanced are:

> (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Id.* at 1502.

stances of each case" mandated by *Pickering*. *Vargas-Harrison*, 272 F.3d at 971.[8] Thus, under the so-called "policy-maker corollary to the *Pickering* analysis," "the First Amendment does not prohibit the discharge of a policy-making employee when that individual has engaged in speech on a matter of public concern in a manner that is critical of superiors or their stated policies." *Id.* at 971-72; *see also Bonds v. Milwaukee County*, 207 F.3d 969, 977 (7th Cir.), *cert. denied*, 531 U.S. 944 (2000).

As we discussed earlier in this opinion, Ms. Kiddy-Brown has alleged facts which, if true, would be sufficient to show that she was not a policymaking employee. Furthermore, Ms. Kiddy-Brown's first amended complaint alleges that she had a weighty interest "in acting as a responsible citizen, and in speaking out on matters of public concern," and that, as a result, her speech was protected by the First Amendment.[9]

---

[8] This exception is based on the rationale that:

> An elected official is entitled to insist on the loyalty of his policymaking subordinates . . . . It would be a strange rule that gave more job protection to policymaking employees who vociferously attack their superiors . . . . It would give policymaking employees and other sensitive employees an incentive to attack their bosses in order to retain their jobs.

*Wilbur v. Mahan*, 3 F.3d 214, 218-19 (7th Cir. 1993).

[9] According to Ms. Kiddy-Brown's complaint, her speech was directed at issues such as "violations by State of Illinois employees of federal and state requirements for filling employment vacancies within IDOC" and "the interference of labor and other non-governmental organizations in the process of filling employment vacancies." R.6 at 8, ¶¶ 53-55. Her amended complaint further alleges that she spoke out about "the unwillingness of Defendants BLAGOJEVICH and WALKER to staff IDOC facilities

(continued...)

R.6 at 8, ¶¶ 53-61. We must assume, on this record, at this early stage of the proceedings, that her interest in speaking outweighs any state interest. We also assume, as we must on this record, the truth of her claims that her speech was the substantial or motivating factor in causing the State defendants to terminate her employment.

In short, these allegations, if true, would establish a constitutional violation. Thus, at this stage in the proceedings, we must conclude that Ms. Kiddy-Brown has alleged facts which, if true, demonstrate that the State defendants violated the Constitution by retaliating against her for her speech. We stress, again, that the district court, presented with a better-developed record, may find that Ms. Kiddy-Brown's factual allegations do not portray accurately her situation. However, at this stage in the proceedings, we must conclude that Ms. Kiddy-Brown has alleged sufficient facts to meet the first part of the qualified immunity inquiry.

## 2.

We now turn to the second part of the qualified immunity inquiry—whether the law was clearly established when Ms. Kiddy-Brown's employment was terminated in December 2003. The State defendants assert that the law on this issue

---

[9] (...continued)
at appropriate levels" and "the safety of IDOC facilities." R.6 at 8, ¶¶ 56-57. We have no problem assuming, at this stage, that these issues are matters of public concern as described by *Connick v. Myers*, 461 U.S. 138, 146 (1983), and *Pickering*, 391 U.S. at 571-72. *See also, e.g.*, *Rhodes v. Chapman*, 452 U.S. 337, 349 n.14 (1981) (noting that a prison's internal security and "[t]he danger of prison riots" present "a serious concern, shared by the public as well as by prison authorities and inmates").

was not clearly established at the time Ms. Kiddy-Brown's employment was terminated because there are no cases that held that the warden of a state prison may not be terminated for her political speech.

At the outset, as we have discussed earlier, a plaintiff is not required to produce a case that is "directly on point" in order to overcome a defendant's assertion of qualified immunity. *Nabozny*, 92 F.3d at 456. Instead, a plaintiff is required to show that the right in question was clearly established at the time the alleged violation occurred; that is, that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. The action's unlawfulness must be "apparent" from pre-existing law. *Id.*

Given the procedural posture of the case, we must assume that Ms. Kiddy-Brown is not a policymaker. "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). If the district court later concludes, on an augmented record, that Ms. Kiddy-Brown held a policymaking position, the district court will be required to determine whether the so-called "policy-maker corollary to the *Pickering* analysis" applies; that is, whether Ms. Kiddy-Brown, as a policymaker, "engaged in speech on a matter of public concern in a manner that [was] critical of superiors or their stated policies." *Vargas-Harrison*, 272 F.3d at 971-72. On this record, however, we must affirm the district court's denial of qualified immunity to the State defendants with respect to Count II of Ms. Kiddy-Brown's amended complaint.

## D. Count III: Due Process

We turn finally to the State defendants' contention that they are entitled to qualified immunity as a defense to

Ms. Kiddy-Brown's claim that she was deprived of a consti-
tutionally protected property interest without due process of
law. The district court concluded that the State defendants
were not entitled to judgment as a matter of law on
Ms. Kiddy-Brown's due process claim. The court reasoned
that, because there exist situations in which a government
official's promise gives rise to an employee's constitution-
ally protected property interest, *see Gorman v. Robinson*, 977
F.2d 350, 356-57 (7th Cir. 1992), and because the details of
Governor Blagojevich's alleged oral statements were not
clear, the facts construed in the light most favorable to
Ms. Kiddy-Brown would entitle her to relief. On this appeal,
the State defendants contend that Ms. Kiddy-Brown cannot
establish that she had a protected property interest in
continued employment as the warden at DCC. In the
alternative, they submit that the law on this question was
not clearly established.

In order to demonstrate that she has been subject to a due
process violation, a plaintiff must show (1) that she had a
constitutionally protected property interest, (2) that she suf-
fered a loss of that interest amounting to a deprivation and
(3) that the deprivation occurred without due process of law.
*See Polenz v. Parrott*, 883 F.2d 551, 555 (7th Cir. 1989). Our
analysis in this case focuses on the first required showing.
A protected property interest in a benefit such as govern-
ment employment is "more than an abstract need or desire"
for the benefit; a person "must . . . have a legitimate claim of
entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577
(1972). "A protected property interest in employment can
arise from a state statute, regulation, municipal ordinance,
or an express or implied contract—those 'rules or under-
standings that secure certain benefits and that support claims
of entitlement to those benefits.' " *Johnson v. City of Fort Wayne*,
91 F.3d 922, 943 (7th Cir. 1996) (quoting *Border v. City of*

*Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996)); *see also Shlay v. Montgomery*, 802 F.2d 918, 921 (7th Cir. 1986) (holding that a property interest in continued government employment "can be created in one of two ways: (1) 'by an independent source such as a state law securing certain benefits' or (2) 'a clearly implied promise of continued employment' " (quoting *Munson v. Friske*, 754 F.2d 683, 692 (7th Cir. 1985))). Because Ms. Kiddy-Brown was employed in Illinois, we look to Illinois law to determine whether she had a property interest in her position as warden. *See Johnson*, 91 F.3d at 943.

The State defendants contend—and Ms. Kiddy-Brown appears to agree—that Ms. Kiddy-Brown cannot point to any state statutory provision that protected her from termination. Indeed, the Illinois Personnel Code, 20 Ill. Comp. Stat. 415/1 et seq., "generally provide[s] employees subject to its procedures a hearing prior to termination for cause." *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004); *see* 20 Ill. Comp. Stat. 415/8b.16 (providing "[f]or hearing before discharge or demotion with the prior approval of the Director of Central Management Services only for cause after appointment is completed, after the person to be discharged or demoted has been presented in writing with the reasons requesting such discharge or demotion"). However, Ms. Kiddy-Brown's position as warden specifically is exempted from the protections just described. *See* 20 Ill. Comp. Stat. 415/4d(2) (exempting the "administrative head of each State . . . correctional institution" from Personnel Code protections, including those of section 415/8b.16). Therefore, Ms. Kiddy-Brown does not have a property interest arising from the Personnel Code.

We turn now to consider other possible sources of property interests. "A property interest in employment arises if there are rules of mutually explicit understandings to sup-

port a claim of entitlement." *Gorman*, 977 F.2d at 356 (internal quotations omitted).[10] The sufficiency of the claim of entitlement is determined by reference to state law. *Id.*

Ms. Kiddy-Brown submits that she had a property interest in continued employment based on assurances made to her by Governor Blagojevich. She contends that Governor Blagojevich made oral statements to her and other people employed by the State of Illinois, promising that he would not "purge state government of . . . men and women who were hired during Republican administrations." R.6 at 11, ¶ 78. She also claims that Governor Blagojevich "promised that if men and women working for the State of Illinois were satisfactorily performing necessary jobs, they would not be terminated by his administration." *Id.* Ms. Kiddy-Brown submits that these alleged statements were sufficient to create a property interest in continued employment.

The State defendants advance four arguments in support of their position that Governor Blagojevich's alleged statements did not create a protected property interest in continued employment. We shall not address all of the arguments because we conclude that the first two of the State defendants' four arguments are sufficient to defeat Ms. Kiddy-Brown's due process claim at the judgment on the pleadings stage. Specifically, we conclude that Governor Blagojevich lacked the necessary authority to bind IDOC to a contract with Ms. Kiddy-Brown. Furthermore, the alleged oral state-

---

[10] *See also Miller v. Crystal Lake Park Dist.*, 47 F.3d 865, 867 (7th Cir. 1995) ("Statutes and regulations are not the only sources of property, but when they are missing the claimant must supply some equivalent expectancy that was legally enforceable . . . such as a mutually binding obligation . . . . 'Mutually binding obligation' is just fancy language for 'contract' . . . .") (internal quotations and citations omitted).

ments were not sufficiently clear and definite to constitute an offer of employment.[11]

We have held that it is "firmly established that the mutually explicit understandings that constitute property interests . . . cannot be based on the representations of government officials who are not authorized to make such representations." *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1334 (7th Cir. 1989) (internal quotations omitted). Ms. Kiddy-Brown has the burden to demonstrate that Governor Blagojevich had the authority to bind the State. *See Schoenberger v. Chicago Transit Auth.*, 405 N.E.2d 1076, 1080 (Ill. App. Ct. 1980).

Ms. Kiddy-Brown contends that the Illinois Constitution, Illinois statutes and an executive order issued by Governor Blagojevich all vested him with the authority to bind the State to an oral employment contract. She submits that, because the Illinois Constitution provides that "the Governor shall have the supreme executive power, and shall be responsible for the faithful execution of the laws," Ill. Const. art. V, § 8, Governor Blagojevich has administrative authority over IDOC. Without further specific authority, and Ms. Kiddy-Brown cites none, we cannot conclude that this broad provision authorizes the Governor to bind the State to an employment contract with Ms. Kiddy-Brown.

With respect to the Illinois statutes, Ms. Kiddy-Brown submits that Governor Blagojevich (along with defendant Walker) is "authorized to make IDOC employment deci-

---

[11] The State defendants also assert that Ms. Kiddy-Brown did not provide any consideration in return for the alleged offer of continued employment and that any alleged oral contract would be unenforceable under the Statute of Frauds.

sions pursuant to" several Illinois statutes.[12] R.6 at 11, ¶ 76. However, these statutory provisions do not specifically give the Governor of Illinois authority to bind the State to an oral employment contract.[13] In fact, one of the Illinois statutes Ms. Kiddy-Brown cites, which she alleges grants the Governor authority to bind the State by his promises, specifically vests the head of the Department of Corrections with authority to appoint the administrative officers of the Department. *See* 730 Ill. Comp. Stat. 5/3-2-2; *see also* 20 Ill. Comp. Stat. 5/5-20. After reviewing these authorities, we think it is clear that Illinois statutes do not grant the Governor the authority to bind the State.

---

[12] Ms. Kiddy-Brown claims that the following statutes vest the Governor with authority to bind the state to an oral contract: 730 Ill. Comp. Stat. 5/3-2-2; 20 Ill. Comp. Stat. 5/5-15; 20 Ill. Comp. Stat. 5/5-20; and 20 Ill. Comp. Stat. 5/5-645. *See* R.6 at 11, ¶ 76.

[13] For instance, 730 Ill. Comp. Stat. 5/3-2-2 simply establishes the powers and duties of the Illinois Department of Corrections and authorizes the Department of Corrections "[t]o appoint and re-move the chief administrative officers, and administer programs of training and development of personnel of the Department," but it does not vest any hiring or firing powers in the Governor. 20 Ill. Comp. Stat. 5/5-15 simply creates the Department of Corrections. 20 Ill. Comp. Stat. 5/5-20 establishes that the Director of Corrections heads the Department of Corrections and calls for the Director of Corrections, "subject to the provisions of the Civil Administrative Code of Illinois, [to] execute the powers and discharge the duties vested by law in his or her respective department." 20 Ill. Comp. Stat. 5/5-645 permits departments, such as IDOC, to "obtain necessary employees," and makes no reference to the Governor. Thus, none of the cited provisions of Illinois law provide the Governor with the authority to bind the State to an oral employment contract.

Ms. Kiddy-Brown also contends that Governor Blagojevich, on January 14, 2003, issued "Executive Order Number 1 regarding employment decisions under his control." R.6 at 11, ¶ 77. According to Ms. Kiddy-Brown, "Executive Order 1 mandates that all employment decisions regarding state employment, including IDOC, are to be made by [Governor] Blagojevich." R.6 at 11, ¶ 77. Although Ms. Kiddy-Brown asserts otherwise, the Supreme Court's decision in *Rutan*, 497 U.S. 62, does not establish the proposition that an executive order can provide a governor with sufficient authority to bind the state to an oral employment contract. The Court's opinion in *Rutan* merely noted that the Illinois Governor at issue in that case had issued an executive order directing a "hiring freeze," allowing the Governor's office "to limit state employment and beneficial employment-related decisions to those who [were] supported by the Republican Party." *Id.* at 65-66. The *Rutan* opinion did not concern the effect that an executive order has on the Governor's authority to bind the State, by his oral promises, to employment contracts. Ms. Kiddy-Brown has cited no other authority besides *Rutan* to demonstrate that a governor may, by executive order, confer on himself the authority to bind the state. What is more, as the State defendants point out, the executive order to which Ms. Kiddy-Brown refers provided that "no agency" of the State could "hire any employee" without "express written permission" from the Governor's office, *see* R.18, Ex.H; this order purported to impose a "freeze" on state hiring, not to grant Governor Blagojevich additional powers to bind the State.

As a result, we must conclude that Ms. Kiddy-Brown has not met her burden to show that Governor Blagojevich had sufficient authority to bind the state to an oral employment contract with her.

However, even if Governor Blagojevich had possessed the authority to bind the State to an employment contract with Ms. Kiddy-Brown, his alleged oral statements were not sufficiently clear and definite to constitute an offer of employment. Under Illinois law, employment contracts are presumed to be terminable at will by either party. *See Taylor v. Canteen Corp.*, 69 F.3d 773, 782 (7th Cir. 1995) (applying Illinois law); *see also Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 317 (Ill. 1987). An employee bears the burden of overcoming the presumption of "at will" employment by showing that the parties contracted otherwise. *See Taylor*, 69 F.3d at 782; *Duldulao*, 505 N.E.2d at 318. This court has recognized that, under Illinois law, "oral employment contracts . . . are viewed with more skepticism than their formal, written counterparts." *Tolmie v. United Parcel Serv.*, 930 F.2d 579, 581 (7th Cir. 1991). When an "alleged contract is based upon oral assurances, the plaintiff must establish that the offer was 'clear and definite' and supported by adequate consideration." *Taylor*, 69 F.3d at 782 (quoting *Kercher v. Forms Corp. of America, Inc.*, 630 N.E.2d 978, 981 (Ill. App. Ct. 1994)). Under Illinois law, an offer is clear and definite as long as "an employee would reasonably believe that an offer has been made." *Duldulao*, 505 N.E.2d at 318. The test is an objective one. *See Tolmie*, 930 F.2d at 581.

In defining what constitutes a clear and definite offer, Illinois courts have held that, when employers tell employees that they will "always have a job" or that they will "never have to anticipate a layoff" or that they were being offered a "permanent position," such statements are not sufficiently clear and definite to constitute an offer of permanent employment. *Wilder v. Butler Mfg. Co.*, 533 N.E.2d 1129, 1130-31 (Ill. App. Ct. 1989). Rather, such statements simply are "optimistic expressions about the future" and "informal expressions of goodwill and hope that naturally occur" between

employer and employee. *Id.* at 1131. As a result, Illinois courts have found such statements "insufficient to establish an oral contract for permanent employment." *Id.*; *see also Titchener v. Avery Coonley Sch.*, 350 N.E.2d 502, 506-07 (Ill. App. Ct. 1976).

Even taking as true all the well-pleaded factual allegations in Ms. Kiddy-Brown's first amended complaint, we must conclude that she has not alleged facts that constitute a due process violation because the statements which Governor Blagojevich is alleged to have made are not sufficiently clear and definite to establish a property interest in continued employment. As the State defendants point out, several of the cases cited by Ms. Kiddy-Brown simply are not applicable to this case.[14]

Still other cases cited by Ms. Kiddy-Brown involved factual circumstances that are different in important ways from the facts of this case. For instance, in *Johnson v. George J. Ball, Inc.*, 617 N.E.2d 1355 (Ill. App. Ct. 1993), the Illinois Appellate Court found that the plaintiff had been offered employment for a term, rather than "at will." In that case, the defendant's oral statements, made in 1988 before the plaintiff was hired, included expressions that the position would entail developing and conducting training programs and that the programs were planned to last until 1991. *See*

---

[14] Some of the cases cited by Ms. Kiddy-Brown do not concern the question of whether an offer was sufficiently clear and definite to support an oral contract for permanent employment. For instance, in *Berutti v. Dierks Foods, Inc.*, 496 N.E.2d 350, 351 (Ill. App. Ct. 1986), the court addressed the proper method for ascertaining the terms of a contract when an oral agreement and a later writing conflict. Another cited case, *Grauer v. Valve & Primer Corp.*, 361 N.E.2d 863, 865 (Ill. App. Ct. 1977), concerns a writing and does not address alleged oral contracts.

*id.* at 1359. In *Johnson*, the defendant's alleged oral statements also encompassed a proposed salary and bonus system. *See id.* In *Taylor*, 69 F.3d 773, this court held that alleged oral representations were sufficiently clear and definite to establish an oral contract. In *Taylor*, the defendant had made oral statements to the plaintiff offering him increased pay and benefits in conjunction with a promotion. *See id.* at 782. In the context of negotiations about the position, the defendant had told the plaintiff that he had " 'nothing to worry about'." *Id.* In the context of further negotiations, the defendant told the plaintiff that he could occupy the new position "for 'as long as [he] wished' and [that] he would have the job 'until he retired or decided he did not want the job anymore.' " *Id.* at 783. In the present case, the alleged statements were far more vague.

Furthermore, even given that the comments made in *Johnson* or *Taylor* could give rise to an employee's reasonable belief that an offer of permanent employment was being made, that does not affect whether a person employed "at will" by the State, as was Ms. Kiddy-Brown, reasonably would have believed that Governor Blagojevich's alleged comments constituted an offer to transform the employment relationship to a permanent one. In *Duldulao*, 505 N.E.2d 314, an amendment to an earlier employee handbook, provided to all employees, suggested that employees who had previously been employed at will were being extended the additional protection of being terminable only for cause. The Supreme Court of Illinois held that a written employee handbook, promulgated by an employer and outlining "Personnel Policies" and the "rights and duties" of employees, *id.* at 316, can transform an at-will employment relationship to a permanent one and can create "enforceable contractual rights if the traditional requirements for contract formation are present," *id.* at 318. The Illinois Supreme Court recognized

three requirements for "an employee handbook or other policy statement" to create "enforceable contractual rights":

> First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement.

*Id.*

Although the *Duldulao* case made reference to "policy statements" and did not impose a requirement that the statements be in writing, it is not clear whether the term "policy statement" refers only to a *written* statement of an employer's policies. *Id.* at 316 (referring to "policy statement" as "amend[ing]" an earlier volume of a written handbook).[15]

---

[15] Some Illinois courts have recognized that *Duldulao v. St. Mary of Nazareth Hospital Center*, 505 N.E.2d 314, 318 (Ill. 1987), is not applicable to a case involving an "alleged oral contract for permanent employment." *Kercher v. Forms Corp. of America, Inc.*, 630 N.E.2d 978, 982 (Ill. App. Ct. 1994). *But cf. Evans v. Gurnee Inns, Inc.*, 645 N.E.2d 556, 559 (Ill. App. Ct. 1994) ("As the plaintiff correctly argues, the court in *Duldulao* did not require that an employee 'policy statement' be in writing to overcome the at-will presumption. We know of no case setting out such a substantive requirement."); *Hany v. Gen. Elec. Co.*, 581 N.E.2d 1213, 1218 (Ill. App. Ct. 1991) ("Thus, if a *Duldulao* contract was created, it was only by the oral tradition that spread the essence of [employer's policy] to the employees and by the 1981 . . . memo that merely referred employees to [the policy].").

Even if *Duldulao* applies to this case, we think that the offer made in this case was not sufficiently clear and definite that an employee reasonably would have believed that an offer of permanent employment had been made. The amendments made in writing in *Duldulao* provided that an employee could be terminated at will during a ninety-day "probationary period" after hiring, but that, after the expiration of the probationary period, employees became "permanent" and could only be terminated with "proper notice and investigation." *Id.* at 316. The Supreme Court of Illinois held that such expressions were "clear enough that an employee would reasonably believe that an offer has been made." *Id.* at 318.

The statements in this case, on the other hand, contained no such concrete references to employee status as permanent and referred to no procedures for termination. Ms. Kiddy-Brown merely alleges that Governor Blagojevich made a "promise[ ] that[,] if men and women working for the State of Illinois were satisfactorily performing necessary jobs, they would not be terminated by his administration." R.6 at 11, ¶ 78. Such words are hardly clear and definite enough to support a reasonable belief that permanent employment has been offered. We think that such an understanding on Ms. Kiddy-Brown's part simply would not have been reasonable.

Under the circumstances of this case, Ms. Kiddy-Brown has alleged facts which clearly are nothing more than "optimistic expressions about the future." *Wilder*, 533 N.E.2d at 1131. At most, the alleged statements constituted "expressions of goodwill and hope," *id.*, between a newly elected governor who was a member of the Democratic party and state employees who had begun their employment under a Republican gubernatorial administration. A reasonable employee would not have believed that an offer of perma-

nent employment was being made to her based on the comments alleged by Ms. Kiddy-Brown.

Because Ms. Kiddy-Brown has failed to allege facts that, if true, would demonstrate a due process violation, our qualified immunity inquiry ends here. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Thus, we need not address the second part of the test for qualified immunity. We reverse the judgment of the district court with respect to Count III of Ms. Kiddy-Brown's amended complaint. The State defendants are entitled to qualified immunity on this count.

## Conclusion

For the reasons set forth in this opinion, the judgment of the district court is affirmed in part and reversed in part, and the case is remanded for proceedings consistent with this opinion. The parties shall bear their own costs on this appeal.

AFFIRMED in part, REVERSED and REMANDED in part

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—5-13-05