WILBUR HANY *et al.*, on Behalf of Themselves and on Behalf of All Others Similarly Situated, Plaintiffs-Appellants, v. GENERAL ELECTRIC COMPANY, Defendant-Appellee.

Fourth District   No. 4—91—0165

Opinion filed November 14, 1991.

George F. Galland, Jr., and Charles Barnhill, Jr., both of Davis, Miner, Barnhill & Galland, P.C., of Chicago, and Davis, Miner, Barnhill & Galland, P.C., of Madison, Wisconsin, for appellants.

Roy G. Davis, Janet L. Jannusch, and Linda L. Laugges, all of Keck, Mahin & Cate, of Peoria, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

Plaintiffs, salaried employees at General Electric's Bloomington, Illinois, facility, sued General Electric (GE) for failing to compensate them for vast amounts of overtime worked since 1982. After trial, the jury returned a general verdict for GE. Plaintiffs appeal, arguing that they proved GE had formed and breached a valid employment contract to pay overtime to its salaried employees under *Duldulao v. Saint Mary of Nazareth Hospital Center* (1987), 115 Ill. 2d 482, 505 N.E.2d 314. Plaintiffs specifically argue that the trial court erred by (1) submitting GE's "modification defense" to the jury; (2) improperly

instructing the jury on how an employer must disseminate a written policy in order to form or modify a *Duldulao* contract; and (3) denying them judgment *n.o.v.*

We affirm.

## I. FACTS

GE established a policy designed to uniformly compensate its salaried employees for overtime, which was announced in a memo entitled "General Purpose Control Department Instruction No. 0-1; Subject: Overtime Payment to Exempt Salaried Employees" (Instruction 0-1). Instruction 0-1 distinguishes "casual overtime" from "payable" overtime. Casual overtime is defined as "intermittent, occasional overtime *** necessary to accomplish the requirements and responsibilities of [a salaried employee's] position." After listing examples of casual overtime, Instruction 0-1 then defines payable overtime as time worked when management would require employees to work in order to respond to the "unusual demands of the business which require that an individual's work be scheduled beyond his normal hours of work. Payable overtime is usually worked under a predetermined and definitely planned overtime work schedule approved in advance."

GE first distributed Instruction 0-1 to its Bloomington plant in 1976 and reissued it in 1983. Although GE never distributed Instruction 0-1 to its nonmanagement employees, the substance of that policy had spread by both word of mouth and a 1981 memo sent by D.A. Hall, the payroll manager, to salaried employees. That memo referred all employees to Instruction 0-1 for a definition of payable overtime. In addition, GE allowed employees to read Instruction 0-1 if they so requested, although GE claims it did not allow them to copy Instruction 0-1 or take it with them from a manager's office.

In 1982, a new general manager, Jesse Lawrence, took over the Bloomington facility, which apparently had undergone some economic troubles. Although GE redistributed a new version of Instruction 0-1 to its management after Lawrence's arrival, Lawrence held monthly meetings at which he consistently stated that the salaried employees needed to work longer hours for which they would *not* receive overtime pay. Many employees testified that they understood as a result of these meetings that they would not receive compensation for these extra hours of work. While a few employees who did not receive advance approval submitted unsuccessful applications for payable overtime to "test the waters" on how Lawrence viewed payable overtime, every employee who received advance approval for payable overtime

received overtime pay. However, Lawrence essentially stopped approving requests for payable overtime.

In 1986, four years after Lawrence arrived at the Bloomington plant, plaintiffs filed this class action lawsuit against GE for breaching its promise to pay overtime demanded of them by management. The trial court certified the class as GE's nonmanagement, salaried employees at the Bloomington plant. At the end of the trial, plaintiffs submitted but then withdrew special verdict forms. Defendant then submitted a general verdict form with special interrogatories for the jury, to which plaintiffs strenuously objected. The trial court agreed with plaintiffs and gave the jury only a general verdict form, which the jury returned in favor of defendant.

## II. THE *DULDULAO* EMPLOYMENT CONTRACT

■■ ■ In *Duldulao*, the Illinois Supreme Court held that when an employer makes a clear policy statement to its employees, an enforceable contract right may arise between the employer and its employees. (*Duldulao*, 115 Ill. 2d at 490, 505 N.E.2d at 318.) The court set forth the following elements a plaintiff must prove to establish such a contract:

"First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement." *Duldulao*, 115 Ill. 2d at 490, 505 N.E.2d at 318.

■ Though *Duldulao* and most of its progeny involved a contract that limited an employer's ability to fire or discipline an employee (*Duldulao*, 115 Ill. 2d at 484, 505 N.E.2d at 315; see also *Daymon v. Hardin County General Hospital* (1991), 210 Ill. App. 3d 927, 929, 569 N.E.2d 316, 317; *Anders v. Mobil Chemical Co.* (1990), 201 Ill. App. 3d 1088, 1090, 559 N.E.2d 1119, 1119-20), a *Duldulao* contract can create other employee rights under a clearly worded, sufficiently disseminated policy that creates expectations in a reasonable employee. We conclude that such a contract could create a right to receive overtime pay.

### A. *The Requirement of Dissemination*

*Duldulao* requires that an employer must disseminate the policy statement in question to its employees in order for that policy state-

ment to constitute an offer to the employees. At least one court has held that an "employer's handbook" that sets out guidelines for supervisors and managers, distributed only to supervisors, does not meet this first condition. (See *Koch v. Illinois Power Co.* (1988), 175 Ill. App. 3d 248, 256-57, 529 N.E.2d 281, 287.) However, while not all the employees in *Koch* could view the guidelines, in the present case GE not only allowed employees to view Instruction 0-1, it also informed its employees that they could do so. Thus, a factual issue arose at trial as to whether GE had disseminated the policy to a sufficient degree among its employees so as to constitute an offer.

■ At trial, GE admitted that it did distribute other information manuals to its salaried employees, such as insurance booklets and a salaried employee handbook, but the manuals neither contained nor referred to Instruction 0-1, and GE never gave nonmanagement employees a copy of Instruction 0-1. Plaintiffs argued at trial that GE did disseminate Instruction 0-1 because, although GE did not give each employee a copy of Instruction 0-1, GE did allow them to view and copy it, and many employees did, in fact, have a copy. GE replied that the employees, without authorization, received their copies from plaintiff Ronald Monkham, a nonmanagement, salaried employee. Monkham testified that he knew GE did not want the salaried employees to receive a copy of Instruction 0-1, so he obtained a copy from a friend of his, a manager in another department, instead of going to his own supervisor for a copy. He then copied Instruction 0-1 and distributed it to other salaried employees.

We find the jury could reasonably have concluded that GE did not disseminate the policy. As such, sufficient grounds exist to affirm the jury's general verdict. See *Moore v. Jewel Tea Co.* (1970), 46 Ill. 2d 288, 294, 263 N.E.2d 103, 106 (holding that any one ground out of many submitted to jury for a general verdict will sustain the verdict), cited with approval in *Peterson v. Henning* (1983), 116 Ill. App. 3d 305, 309-10, 452 N.E.2d 135, 138-39.

### B. *Modification of the Employer's Policy Statement*
Plaintiffs argue that the trial court erred in submitting defendant's "modification defense" to the jury because no material fact existed as to whether GE modified the contract.

### 1. Under *Duldulao*, An Employer Policy Creates A Continuing Offer, Not An Interminable Contract
Plaintiffs essentially argue that GE and its employees formed a contract because GE distributed Instruction 0-1 to its management,

the employees learned of that policy through reading it or through word of mouth at the plant, and the employees worked extended schedules after learning of the contract. Because Instruction 0-1 never changed, plaintiffs argue that GE never modified the *Duldulao* contract Instruction 0-1 created. GE argues in response that if a contract was entered into, Lawrence modified it by telling the employees they would not receive overtime pay for the extra hours worked.

Assuming *arguendo* that GE did, in fact, sufficiently disseminate Instruction 0-1 in the first place so as to create a *Duldulao* contract, plaintiffs misconstrue the nature of the contract created. On this record, an employer distributing a policy statement like Instruction 0-1 does not make a contract, but rather makes a continuing offer to employees who work overtime. As with any offer, the employer may rescind or modify its offer before an employee accepts by working overtime. See *Condon v. American Telephone & Telegraph Co.* (1991), 210 Ill. App. 3d 701, 705, 569 N.E.2d 518, 520 ("We believe an employer may unilaterally alter existing policies to disclaim those policies in order to prevent contractual obligations from arising under *Duldulao*"); *Ohlemeier v. Community Consolidated School District No. 90* (1985), 151 Ill. App. 3d 710, 717, 502 N.E.2d 1312, 1317 (employer can modify a *Duldulao* contract with at-will employees at any time).

In *Garber v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 675, 678-80, 432 N.E.2d 1309, 1311-12, the court held that a credit card issuer and holder do not hold a single, interminable, and unmodifiable contract under which the issuer agrees to extend credit to the holder. Instead, the credit card issuer makes a continuing offer to extend credit to the holder that the holder accepts each time he uses the card. As such, the parties enter into many individual contracts as the issuer allows the holder to use the card and the holder does, in fact, use it. Accordingly, *Garber* held that an issuer may modify the terms of the credit arrangement at any time, which would affect the terms of the subsequent contracts that arise when the holder thereafter uses the card.

Similarly, an employer who issues a policy statement like Instruction 0-1, under which it agrees to pay overtime in certain circumstances, may terminate or modify the offer contained in that policy statement at any time. Although modification presumably would not affect any rights which accrued prior thereto, it would alter the terms under which the employees thereafter accepted the modified offer by working overtime. Accordingly, an employer may prove that it modified the offer contained within a sufficiently disseminated policy state-

ment by disseminating that modification to the same or greater extent that it disseminated the original policy statement.

### 2. Submitting Defendant's "Modification Defense" to the Jury and Denying Plaintiff's Motion for Judgment *n.o.v.*

Plaintiffs argue that the trial court erred in allowing defendant to argue that it had modified the *Duldulao* contract. They point out that at no time did GE rescind Instruction 0-1 and that Lawrence's oral modifications did not suffice to modify a written policy statement. As such, plaintiffs argue that the trial court ought not have allowed the jury to consider modification because no factual dispute existed that a contract to pay for overtime arose between GE and its employees.

■■ Initially, we disagree with plaintiffs' argument that the trial judge, not the jury, should have determined whether a contract existed. Though courts have unqualifiedly held that "[t]he question of the existence of a contract is a matter of law for determination by the court" (*Bennett v. Evanston Hospital* (1989), 184 Ill. App. 3d 1030, 1033, 540 N.E.2d 979, 981, citing *Bank of Benton v. Cogdill* (1983), 118 Ill. App. 3d 280, 454 N.E.2d 1120; see also *Robinson v. Christopher Greater Area Rural Health Planning Corp.* (1991), 207 Ill. App. 3d 1030, 1037, 566 N.E.2d 768, 772), this rule applies only when no factual dispute exists. (*Bank of Benton*, 118 Ill. App. 3d at 288, 454 N.E.2d at 1125.) When a factual dispute is present, the question of whether a contract exists is for the jury to decide. (*Commonwealth Edison Co. v. Industrial Comm'n* (1988), 167 Ill. App. 3d 229, 233, 521 N.E.2d 159, 162 ("The existence of a contract is a question reserved for the trier of fact, and this question becomes a question of law only if the facts are undisputed and reasonable men would agree as to the inferences drawn from them").

In the present case, two clear factual issues are present on the question of whether a contract existed: (1) did GE sufficiently disseminate Instruction 0-1 to its employees through their general awareness, as well as through GE's referring to that policy in memos to its employees, even though it never distributed a copy to the employees; and (2) if GE did sufficiently disseminate this policy, did GE, through Lawrence's statements at the monthly meetings, modify its continuing offer to pay overtime.

■■ Plaintiffs' own evidence established that Lawrence contradicted the employees' expectations under Instruction 0-1 by making it clear at the monthly meetings that he would not approve overtime pay for the extra hours required of salaried employees. Therefore, because these two factual issues remained unresolved, the trial court

could not have ruled that a contract existed as a matter of law. Accordingly, the trial court did not err in submitting both questions to the jury, nor in denying plaintiffs' motion for judgment *n.o.v.* once the jury found for GE.

Had GE distributed Instruction 0-1 to employees in an employee handbook, then plaintiffs' argument—that a plant manager's attempt to curb the written policy by oral statements at employee meetings is not sufficient to modify the contract—would be much stronger. However, GE distributed Instruction 0-1 to the plant *management*, not its employees. Thus, if a *Duldulao* contract was created, it was only by the oral tradition that spread the essence of Instruction 0-1 to the employees and by the 1981 Hall memo that merely referred employees to Instruction 0-1. To the extent that such a policy creates a *Duldulao* contract, GE need not have distributed a written memo or new policy statement to rescind a written policy that the employees never received. Rather, it could modify that policy in the same way it created it: by countering that oral tradition with clear statements to employees that they would not receive overtime pay for expanded scheduled work. Because the jury heard sufficient evidence that Lawrence repeatedly conveyed that message to GE employees, we find the general verdict in favor of defendant was not contrary to the manifest weight of the evidence.

### C. *Instructing the Jury on Dissemination*

Plaintiffs also argue that the trial court erred in the manner it instructed the jury on dissemination. Both parties originally submitted instructions on the definition of "dissemination," but the trial court declined to use any of those instructions. During its deliberations, the jury sent a note to the judge requesting a definition of dissemination. The trial court then gave the jury, over plaintiffs' counsel's objections, a dictionary definition of the word "disseminate": "The word 'disseminate' means to broadcast widely; to spread, scatter, or disperse." We find no error in the trial court's action.

■ The trial court has the discretion to determine what instructions to give the jury and we will not disturb the exercise of its discretion unless it has been clearly abused. (*Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1087, 560 N.E.2d 969, 972.) Though the trial court need not define words of common usage and understanding (*De Rosa v. Albert F. Amling Co.* (1980), 84 Ill. App. 3d 64, 75, 404 N.E.2d 564, 572), it should respond, when appropriate, to an explicit question by the jury on a point of law relevant to the delibera-

tion. *Kingston v. Turner* (1985), 133 Ill. App. 3d 677, 681, 479 N.E.2d 410, 412.

Upon receiving a note from the jury that it did not know what "disseminate" meant, the court provided an ordinary, neutral, nonargumentative definition. By doing so, the court appropriately answered the jury's question.

Plaintiffs cited *Ohlemeier* to the trial court in support of their requested jury instruction defining "dissemination." While a trial court should inform a jury of judicial or legal interpretations of an ordinary term (*Kingston*, 133 Ill. App. 3d at 681, 479 N.E.2d at 412), no such judicial interpretation of the word "dissemination" exists to support plaintiffs' proposed instruction. *Ohlemeier* hardly discussed dissemination and contains no such legal interpretation.

■ The court also properly rejected plaintiffs' request that it give the following instruction: "It is not necessary to find that GE individually gave all exempt employees a copy of *** Instruction [0-1] itself." That jury instruction would have overemphasized the fact that GE need not distribute the manual to all employees in order to disseminate it. See *Villa*, 202 Ill. App. 3d at 1088, 560 N.E.2d at 972 (a court should take care to not give instructions that overemphasize any particular matter).

On appeal, plaintiffs cite *Arneson v. Board of Trustees* (1991), 210 Ill. App. 3d 844, 569 N.E.2d 252, for the proposition that an employer can disseminate a policy statement by giving employees a document that refers to the policy statement. They argue that *Arneson* means that an employer need not give each employee a copy of the policy statement. However, *Arneson* involved an employment contract that incorporated the employer's policy statement and not, as here, a single 1981 memo from the payroll manager to employees that casually referred employees to Instruction 0-1. Instead of merely referring to a source in which the policy statement may be found, the *Arneson* employment contract *incorporated* the policy statement. (*Arneson*, 210 Ill. App. 3d at 851, 569 N.E.2d at 257.) Because no clear judicial gloss exists on the definition of dissemination, and because the supreme court apparently used this common term in its ordinary sense in *Duldulao*, the trial court did not err by refusing plaintiffs' instruction.

### D. *Other Issues*

■ We need not address the other issues plaintiffs raise on appeal challenging the jury's verdict because we find sufficient evidence to sustain the verdict in favor of GE on the basis of either insufficient

dissemination of Instruction 0-1 or sufficient modification of that policy by GE. When a jury considers many alternative grounds for a general verdict, a reviewing court can sustain the general verdict, without speculating as to which ground the jury found persuasive, if any one of those grounds support the general verdict. (*Moore*, 46 Ill. 2d at 294, 263 N.E.2d at 106 (holding that a single ground out of many submitted to jury for a general verdict will sustain the verdict); *Peterson*, 116 Ill. App. 3d at 309-10, 452 N.E.2d at 138-39.) To the extent that plaintiffs think this procedure inadequate because the jury might have actually rejected the insufficient dissemination or sufficient modification theories and accepted the other theories advanced by GE to defeat plaintiffs' claims, plaintiffs (1) should not have withdrawn their own special verdict forms, (2) should not have objected to defendant's special interrogatories, (3) should have suggested modifications to defendant's interrogatories, or (4) submitted special interrogatories that the court would have accepted.

### IV. Conclusion

For the reasons stated, we affirm the judgment of the circuit court.

Affirmed.

LUND, P.J., and McCULLOUGH, J., concur.