In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1081

BUSINESS SYSTEMS ENGINEERING, INC.,

*Plaintiff-Appellant,*

*v.*

INTERNATIONAL BUSINESS MACHINES CORP.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 8254—**Elaine E. Bucklo**, *Judge.*

ARGUED SEPTEMBER 4, 2008—DECIDED NOVEMBER 10, 2008

Before MANION, WOOD, and TINDER, *Circuit Judges.*

MANION, *Circuit Judge.* Business Systems Engineering, Inc. ("Business Systems") brought this diversity suit against International Business Machines Corp. ("IBM"). Business Systems alleged, among other things, that IBM had an agreement with Business Systems to provide Business Systems with $3.6 million in work as a subcontractor on a project IBM was completing for the Chicago

Transit Authority ("CTA"). Because IBM had provided Business Systems with only $2.2 million in work, Business Systems claimed that IBM still owed it $1.4 million. The district court granted IBM summary judgment, and Business Systems appeals. We affirm.

## I.

In December 2001, the CTA entered into a contract with IBM under which IBM agreed to implement a new computer system for the CTA. A condition appended to the contract required IBM to subcontract not less than 30% of the total dollar value of the contract (which was $42 million) to "disadvantaged business enterprises."[1] Business Systems was certified by the CTA as a disadvantaged business enterprise, and it was one of ten disadvantaged business enterprises that provided technical consultants for IBM to work on the CTA contract.

When utilizing the services of a supplier like Business Systems, IBM would first enter into a base agreement with the supplier that would govern their overall business relationship. Such agreements are common in the industry. The "Customer Solutions Agreement" ("CSA") was the specific base agreement governing the

---

[1] The contract defined a "disadvantaged business enterprise" as "a small business concern awarded certification by the CTA as a business owned and controlled by socially and economically disadvantaged individuals in accordance with U.S. DOT Regulation 49 CFR, Part 23 and Section 106(c)."

relationship between IBM and Business Systems; it was created prior to IBM's contract with the CTA. According to the detailed terms of the CSA, Business Systems was to provide "deliverables and services" according to the specifications contained in the relevant "statements of work." The CSA defined a "statement of work" as "any document . . . which describes the Deliverables and Services, including any requirements, specifications or schedules." Business Systems was not to begin the tasks described in a statement of work, however, without a corresponding "work authorization," which the CSA defined as "a purchase order, bill of lading, or other [IBM] designated document." The CSA limited what IBM owed Business Systems to the amounts specified in statements of work and authorized in work authorizations. It stated that "the only amount due to [Business Systems] from [IBM]" was the "pre-approved expenses specified in the relevant" statements of work and the amount IBM would pay for "Deliverables and Services specified in a [purchase order] and accepted by" IBM.

Before the CTA executed its contract with IBM and work began, IBM had to submit to the CTA a "Schedule C: Letter of Intent from DBE to Perform as Subcontractor, Supplier and/or Consultant" signed by each disadvantaged business entity that was to provide work as a subcontractor, as well as a "Schedule D: DBE Utilization Plan" signed by IBM. The original Schedule C for Business Systems, attached as Exhibit 3 to Business Systems's original complaint, listed the "quantity/unit price" of "services" Business Systems was "prepared to provide" for the CTA project as $8,560,000. A revised Schedule C listed

"services" of $2,124,550 and "software" of $1,500,000 as the "quantity/unit price" of what Business Systems was "prepared to provide" for the CTA contract. The Schedule D IBM submitted to the CTA for Business Systems listed "provid[ing] development resources for conversions, interfaces, and customizations" as the "type of work to be performed" in accordance with the revised Schedule C. It also listed $3.6 million under the heading "Contract Amount." All of the schedules stated that, after the CTA executed the contract, the parties would "enter into a formal written agreement for the above work."

The CTA approved the contract with IBM, and the work on the CTA project proceeded as follows. When IBM needed a specific task performed on the CTA project by an outside technical consultant, it advertised the open position to one of the approved disadvantaged business enterprises, like Business Systems. If Business Systems presented a candidate for the open position that was acceptable to IBM as well as the CTA (which retained the right to reject any individual candidate put forth by IBM or one of IBM's subcontractors to work on the project), then IBM would send Business Systems a statement of work. Those statements of work expressly incorporated all of the terms and conditions of the CSA, the base agreement. Each statement of work set forth in detail the project scope, tasks that Business Systems's consultants were to perform, the time frame within which the consultants were to perform them, the hourly rate of pay and estimated hours required to complete the tasks, and the conditions under which IBM would deem Business Systems to have fulfilled its obligations

under each statement of work. After Business Systems received the statement of work, IBM would issue a work authorization in the form of a purchase order authorizing the allocation of funds to Business Systems.

In total, Business Systems received 38 statements of work from IBM for the CTA project. Together with the corresponding purchase orders, the statements of work authorized roughly $2.2 million in work on the project. It is undisputed that IBM paid Business Systems for all the work that Business Systems did pursuant to those statements of work. It is further undisputed that, at certain times during the project, Business Systems failed to submit candidates to fill an open position on the CTA project. Business Systems also fell behind in paying some of its own subcontractors, causing those subcontractors to threaten to leave the CTA project.

At the conclusion of the CTA project, IBM had provided work to disadvantaged business enterprises in the amount of 42% of the total contract value, a figure in excess of the 30% requirement set forth in the condition accompanying the contract between IBM and the CTA. Of the ten disadvantaged business enterprises that participated in the CTA project, eight exceeded the dollar value listed on their Schedules C and D. Two, however, did not. One of those two was Business Systems, which only received $2.2 million in work as opposed to the $3.6 million listed on its Schedules C and D.

Business Systems believed it was entitled to the additional $1.4 million—the difference between the $3.6 million listed on its Schedules C and D and the $2.2 million for

the completed subcontracting work it had actually received. It therefore filed suit in state court alleging, among other things, that the Schedules C and D constituted a written contract that IBM breached by failing to provide Business Systems with $3.6 million in work on the CTA project. IBM removed the action to the district court and moved to dismiss the complaint. It argued that the Schedules C and D were not contracts but merely letters of intent that "evidence[d] the parties' anticipation of a future executed contract." The district court agreed with IBM and dismissed the suit.

Business Systems then filed an amended complaint. In its amended complaint, Business Systems still alleged that the Schedules C and D were part of the "written agreement" between Business Systems and IBM. However, the amended complaint also detailed a collection of other documents that Business Systems asserted "evidence[d] the written agreement" between itself and IBM. One of the documents described in the amended complaint was an email from IBM's client director Jim Lautenbach to the CTA explaining that Business Systems's participation in the CTA project had been set at $3.6 million "by mutual agreement." The email contained a spreadsheet attachment entitled "BSE Work" that set forth how IBM and Business Systems planned to achieve the $3.6 million objective. Under the heading "Description of Work," the spreadsheet listed "Wage Rate/Wage Progression Study," "Supplemental Training Services," "IT Replacement Services," "Post Production Support," "HR Functional Resources," "HR Technical Resources," and "Wage Rate/Wage Progression

Customization." Corresponding to each of those entries under the "Description of Work" heading was a spread-sheet entry for "Related Task Order," "Projected BSE Revenue," and "Estimated Contract Date."

IBM unsuccessfully attempted to have the amended complaint dismissed, and the case proceeded to discovery. After discovery, IBM moved for summary judgment on all of Business Systems's claims. In that motion, IBM argued that it was entitled to judgment as a matter of law on Business Systems's breach of contract claim because the statements of work, along with the corresponding purchase orders, formed the only contractual relationship between the parties, and it was undisputed that IBM had fulfilled all that the statements of work had obliged it to do. In response to that argument, Business Systems argued that genuine issues of material fact remained concerning whether IBM had formed an oral agreement with Business Systems for $3.6 million in work on the CTA project, and whether IBM had breached that agreement by only providing $2.2 million of work on the project.

The district court granted IBM's motion for summary judgment. It held that there was no evidence of a written contract for $3.6 million between IBM and Business Systems. According to the court, the documents upon which Business Systems relied were "too vague and incomplete to establish a legally enforceable agreement by which [Business Systems] could hold IBM accountable for the alleged breach." *Bus. Sys. Eng'g, Inc. v. IBM Corp.*, 520 F. Supp. 2d 1012, 1019 (N.D. Ill. 2007). The

district court also rejected Business Systems's oral contract theory. The court stated that although the facts established that Business Systems may have believed that it had an agreement with IBM for $3.6 million of work, the record did not contain any "evidence about what promises [Business Systems] made in exchange" for the $3.6 million of work on the CTA project. *Id*. at 1019.

After the district court granted IBM's motion for summary judgment, it entered a final judgment on all of Business Systems's claims pursuant to Federal Rule of Civil Procedure 54(b). That final judgement allowed Business Systems to appeal the district court's grant of summary judgment despite IBM's unresolved counterclaim for defamation against Business Systems and Nathan Paige, Business Systems's CEO.

## II.

On appeal, Business Systems only challenges the district court's determination that no contract for $3.6 million in work existed between Business Systems and IBM as a matter of law. We review a district court's grant of summary judgment de novo. *See Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677 (7th Cir. 2008). We construe all facts and inferences in the light most favorable to Business Systems, the non-movant, when determining whether a genuine issue of material fact exists that would preclude summary judgment. *Id*. Because this is a diversity case, we apply the law of Illinois (the forum state) to the question of whether a contract exists.

*Id*. In Illinois, "[t]he question of the existence of a contract is a matter of law for determination by the court." *Arneson v. Bd. of Trs., McKendree Coll.*, 569 N.E.2d 252, 256 (Ill. App. Ct. 1991).[2]

At the outset, we note that Business Systems's theory of how the contract for $3.6 million arose has fluctuated throughout the proceedings in this case. In its initial complaint, Business Systems alleged that the original Schedule C constituted a written agreement between it

---

[2] Business Systems argues that the existence of a contract in this case was a question of fact that should have been left for the jury. Business Systems is correct that a jury should decide the question of whether a contract exists when the facts bearing on that issue are disputed. *See, e.g.*, *Hany v. Gen. Elec. Co.*, 581 N.E.2d 1213, 1217 (Ill. App. Ct. 1991) ("When a factual dispute is present, the question of whether a contract exists is for the jury to decide."). But in this case the material facts are not disputed. IBM does not question, for instance, the existence or authenticity of the Schedules C and D, or even that IBM evinced an intent to be bound to the $3.6 million figure. Rather, the issue here is whether the evidence presented by Business Systems suffices to show a binding contract obligating IBM to provide Business Systems with $3.6 million in work. That question was properly determined by the district court, and not a jury. *See Bank of Benton v. Cogdill*, 454 N.E.2d 1120, 1125 (Ill. App. Ct. 1983); *see also Mansourou v. John Crane, Inc.*, 618 N.E.2d 689, 692 (Ill. App. Ct. 1993) ("The determination of whether there exists a clear and definite promise is not for the trier of fact to determine, but is, rather, 'a threshold question of law to be determined by the court.'" (quoting *Harrell v. Montgomery Ward & Co.*, 545 N.E.2d 373, 376 (Ill. App. Ct. 1989))).

and IBM that was "voluntarily modifi[ed]" by the revised Schedule C. After the district court rejected that theory, Business Systems amended its complaint, this time alleging that the parties had a "written agreement" composed of various emails and letters between the parties along with the Schedules C and D. During discovery, Business Systems waffled between a written contract theory and an oral contract theory, sometimes asserting that the contract between the parties was oral, and at other points claiming that the Schedules C and D, as well as other documents, constituted a written contract. Then in opposition to IBM's motion for summary judgment, Business Systems switched entirely to an oral contract theory. Now on appeal, Business Systems reiterates its position on summary judgment that there was an oral contract between the parties and that the documents Business Systems cited in its amended complaint (including the Schedules C and D) are simply evidence of that oral agreement.

Regardless, however, of whether the alleged $3.6 million contract was written, oral, or otherwise, the district court was correct to grant summary judgment on Business Systems's breach of contract claim. The only contractual relationship that existed between the parties was established by the CSA in conjunction with the individual statements of work and the corresponding purchase orders. The CSA established, in writing, "the basis for a multinational procurement relationship under which [Business Systems would] provide [IBM] the Deliverables and Services described in [statements of work] issued" pursuant to the CSA. The CSA was clear that Business

Systems was to "provide the Deliverables and Services as specified in the relevant" statements of work "*only after* receiving" a purchase order from IBM authorizing the work listed in each statement of work to be done. (Emphasis added). And the CSA expressly limited what IBM owed Business Systems to those amounts that were specified in the purchase orders and statements of work issued pursuant to the CSA. It stated that "pre-approved expenses specified in the relevant" statements of work and the amount IBM would pay for "Deliverables and Services specified in a [purchase order] and accepted by" IBM were to be "the only amount due to [Business Systems] from [IBM]."

The parties' business relationship during the CTA project unfolded exactly as the CSA defined it. IBM would submit a statement of work and a purchase order to Business Systems. Business Systems then would do the work specified in the statement of work and receive payment from IBM pursuant to the terms listed in the statement of work. Because there is no dispute that IBM timely paid Business Systems for all that it did pursuant to the statements of work (which amounted to $2.2 million in work), Business Systems's breach of contract claim fails as a matter of law.

Business Systems attempts to step outside the framework of the CSA and the statements of work. It admits that no legally enforceable agreement for $3.6 million existed *in writing* between the parties. But it argues that the existence of an *oral* contract for $3.6 million can be inferred from the documents referred to in its amended

complaint as well as from the parties' interactions during the CTA project. Appellant's Br. at 8 (citing, inter alia, *Reese v. Forsythe Mergers Group, Inc.*, 682 N.E.2d 208, 213 (Ill. App. Ct. 1997) ("[O]ral contracts are proved not only by what the parties have said, but also by what they have done.")).

Business Systems's oral contract theory has no merit. To begin with, the only reasonable inference that can be drawn from the parties' dealings during the CTA project is that they were acting pursuant to the CSA, and it is undisputed that neither the CSA nor the statements of work issued pursuant to that agreement contained a promise for $3.6 million in work. Furthermore, even drawing all reasonable inferences from the documentary evidence in Business Systems's favor, a jury could not find that a contract for $3.6 million existed as a matter of law because Business Systems has failed to identify any of the material terms of the alleged contract—other than the $3.6 million it claims IBM agreed to pay it. "The principles of contract state that in order for a valid contract to be formed, an offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain." *Acad. Chicago Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991) (internal quotation marks omitted). "A contract 'is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do.'" *Id.* (quoting *Morey v. Hoffman*, 145 N.E.2d 644, 647-48

(Ill. 1957)). Put another way, "[p]arties do not have an enforceable contract unless, by the terms of the agreement, a court 'can require the specific thing contracted for [ ] be done.'" *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 850 (7th Cir. 2007) (quoting *Hintz v. Lazarus*, 373 N.E.2d 1018, 1020 (Ill. App. Ct. 1978)).

The documents upon which Business Systems relies to establish the alleged $3.6 million contract are too indefinite to show the existence of a contractual relationship. In particular, there is no way to tell from those documents what Business Systems was to do in exchange for the $3.6 million. The revised Schedules C and D are remarkably vague as to Business Systems's part of the bargain. They simply list "services" and "software" and "provid[ing] development resources" as what Business Systems was obligated to provide IBM in exchange for the $3.6 million, with no further detail. They do not state, with any reasonable specificity, what services, software, and "development resources" Business Systems was to provide. Beyond that, there is no mention of when and where Business Systems was to provide those services, software, and "development resources"; what set of criteria was to be used to establish that Business Systems satisfactorily provided them; and when and how the parties were to handle payment.

The spreadsheet attached to Lautenbach's email is similarly vague.[3] It, too, lists only highly generalized

---

[3] Business Systems did *not* argue before the district court, as it does now, that the spreadsheet evidenced some of the terms

(continued...)

descriptions of the work Business Systems was to provide, such as "Wage Rate/Wage Progression Customization" and "HR Functional Resources." No explanation is given in the spreadsheet of what those tasks entail. Furthermore, the revenue and contract dates corresponding to each task are listed only as "projected" and "estimated," respectively. No mention is made in the spreadsheet about criteria for determining when Business Systems had performed each task, nor of any specifics about when and how Business Systems was to receive payment. Without the provision of such terms, we lack the ability to enforce any agreement between the parties, since we would not be able to determine what each party had agreed to do. *Cf. Ass'n Benefit Servs.*, 493 F.3d at 850 (finding letter between the parties that was "silent on the issue of [the appellant's] precise performance obligations . . . so lacking in its description of the exchange as to render it wholly unenforceable as a contract"); *Cheever*, 578 N.E.2d at 983-84 (holding that publishing agreement was not enforceable where the agreement lacked, among other things, a definition of the criteria that would render the manuscript satisfactory to the publisher); *Reese*, 682 N.E.2d at 214-15 (holding that alleged employment agree-

---

[3] (...continued)
of the alleged contract. "[A]rguments not raised before the district court are waived on appeal." *Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 652 (7th Cir. 2007). Nevertheless, even considering the spreadsheet, Business Systems still falls far short of establishing, with any definiteness, what services it was to provide for IBM in exchange for the last $1.4 million of the alleged $3.6 million contract.

ment was unenforceable because it was "unclear" from the alleged agreement "what [the plaintiff] and the defendants [had] agreed to do").

Contrast the Lautenbach spreadsheet and the Schedules C and D with the statements of work. Each statement of work expressly set forth in detail the specific services Business Systems would provide IBM, the hourly rate IBM would pay for those services, and the estimated number of hours. Most importantly, the statements of work gave specific conditions under which IBM would deem Business Systems to have fulfilled its performance obligations. Those terms contained in the statements of work were in turn supplemented by the detailed provisions of the CSA, which each statement of work expressly incorporated. A court would have no difficulty determining and remedying any breach of an individual statement of work given those detailed and specific terms.

The same cannot be said of Business Systems's alleged $3.6 million agreement. At best, the evidence in the record shows that IBM "intended" to offer Business Systems $3.6 million in subcontracting work. But a manifestation of an intent to be bound, by itself, is not enough to form a contract. *Cheever*, 578 N.E.2d at 983. "Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." *Vill. of S. Elgin v. Waste Mgmt. of Ill., Inc.*, 810 N.E.2d 658, 672 (Ill. App. Ct. 2004) (quoting Restatement (Second) of Contracts § 33(1) (1981)). The terms of a contract are reasonably certain only if "they provide a basis for determining the existence of a breach and for

giving an appropriate remedy." Restatement (Second) of Contracts § 33(2) (1981). As we have discussed above, the documents that Business Systems points to as evidence of IBM's "intent to be bound" to the $3.6 million figure, such as the Schedules C and D, do not provide "a basis for determining the existence of a breach and for giving an appropriate remedy." *Id*. Put another way, conspicuously absent from the record is the answer to the question: "$3.6 million for what?" Because we have no way of determining with any specificity what Business Systems was supposed to do in exchange for the $1.4 million it claims IBM still owes it under the alleged $3.6 million contract, Business Systems's breach of contract claim fails as a matter of law, and the district court properly granted summary judgment on that claim.

### III.

The CSA, along with the statements of work and purchase orders issued pursuant to that agreement, formed the only basis of a contractually binding agreement between the parties. Regardless of what the parties intended from the outset, IBM had no contractual duty to provide Business Systems with any work beyond what was authorized in the statements of work. Because it is undisputed that IBM paid Business Systems all that was due for performing work pursuant to the statements of work, we AFFIRM the decision of the district court granting summary judgment in favor of IBM on Business Systems's breach of contract claim.