In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 23-1302 & 23-2206

THOMPSON CORRUGATED SYSTEMS, INC. and THOMPSON
CORRUGATED SYSTEMS, LLC,

*Plaintiffs-Appellees*,

*v.*

ENGICO, S.R.L.,

*Defendant-Appellant*.

———————————

Appeals from the United States District Court for the
Southern District of Illinois.
No. 3:20-cv-00122 — **J. Phil Gilbert**, *Judge*.

———————————

ARGUED SEPTEMBER 20, 2023 — DECIDED JULY 31, 2024

———————————

Before RIPPLE, JACKSON-AKIWUMI, and LEE, *Circuit Judges*.

JACKSON-AKIWUMI, *Circuit Judge*. Two decades ago,
Thompson Corrugated Systems, Inc., orally agreed to act as
the North America sales representative for Italian manufac-
turer Engico, S.r.l. But after more than a decade of low sales,
the relationship began to sour and Engico wanted out. When
Engico found another representative and tried to end the

relationship, Thompson Corrugated Systems objected, sought commissions on some of Engico's recent sales, and sued when Engico refused to pay. The district court granted partial summary judgment in favor of Thompson Corrugated Systems. We affirm.

**I**

Thompson Corrugated Systems, Inc. ("TCS"), is an Illinois company that has represented builders of corrugated box machinery since 1988. Engico, S.r.l., based in Lissone, Italy, produces and sells corrugated box machinery around the world.

Engico did not conduct any business in North America until 2004. That year, the principals for TCS and Engico, Fred Thompson, Sr., and Raphael Benzoni, respectively, entered into an oral agreement to have TCS serve as Engico's representative in North America. The parties agreed that Engico would compensate TCS with "an 8% commission of [sic] Engico sales, less transportation and installation costs."

As Engico's representative in North America, TCS was responsible for creating promotional videos and brochures and attending expos and trade shows to advertise Engico's products. Executing these responsibilities led TCS to procure two sales for Engico between 2004 and 2017. The first sale was to Lawrence Paper in 2005 for €2,900,000.00. For this sale, Engico paid TCS a commission of 8% of the machine's gross sale price consistent with the parties' agreement the year before. The next sale was to Jayhawk Boxes, Inc., a wholly-owned subsidiary of Lawrence Paper, in 2017 for €3,450,000.00. TCS's commission on this sale differed because in 2012, the parties renegotiated the commission structure. Under the new agreement, TCS's commissions would be calculated on a sliding scale:

TCS would receive 6% for the first million euros of the machine's gross sale price, 5% for the next million, 4% for the next million, and 3% on any additional amounts. The commission TCS earned for the 2017 sale to Jayhawk Boxes was consistent with the sliding scale agreement.

But prompt payment for the 2005 and 2017 sales did not mean all was well between TCS and Engico. To the contrary, their relationship had begun deteriorating before the 2017 sale. In October 2016, Engico attempted to terminate its agreement with TCS due to lack of sales. TCS resisted. TCS explained that the low sales were caused by a slump in the North American manufacturing market, which was just beginning to recover. Switching representatives just as the market was recovering was not wise, TCS warned, but if Engico still wanted to, TCS would need "the normal six-month notice of pending termination." During that time, TCS offered to continue representing Engico and to prepare a list of companies that would be interested in doing business with Engico over the next 12 months. That list, TCS explained, would provide the basis for any residual commissions TCS would be entitled to for its role in developing those prospective customers. The parties dispute whether Engico accepted TCS's proposal, but it is undisputed that Engico allowed TCS to stay on beyond the six-month notice period. Indeed, as late as October 2017, Benzoni was still telling prospective customers that TCS was Engico's representative in the United States.

The topic of termination came up again in February 2018, when Benzoni and Thompson met in Charlotte, North Carolina, to define the parties' relationship. In Charlotte, they agreed that (1) TCS would remain Engico's North America representative until Thompson retired at the end of 2021, and

(2) TCS would continue to receive commissions on all sales in North America through 2021. But as both parties got back to work, that agreement proved fragile. Engico's subsequent sales in North America highlighted that fragility.

In May 2019, Engico sold another machine to Lawrence Paper. TCS was not involved in that sale. TCS says it is because Engico cut them out; Engico says it was because Lawrence Paper did not want TCS involved. Whatever the reason, all agree that TCS did not receive a commission for that sale. Instead, four days after the sale, Benzoni called Thompson to inform him that Engico intended to terminate the parties' business relationship effective January 1, 2020. Benzoni also said that Engico would only pay TCS commissions for business solicited directly by TCS. Thompson objected during that call and again in writing eight days later, explaining that Engico's desired course departed from the agreement the parties reached in Charlotte.

The termination discussions continued over the next few months. In August 2019, Benzoni and Thompson met at the Haire Group's offices in Merrillville, Indiana. By that point, Engico had selected Haire to replace TCS when the termination was complete. At the August 2019 meeting, Benzoni reiterated that Engico would terminate the relationship effective on January 1, 2020. The parties have different recollections about the rest of that meeting. Engico represents that it made two offers to TCS: first, Engico offered to pay TCS a commission based on the sliding scale for the May 2019 sale to Lawrence Paper; second, Engico offered TCS the opportunity to work with Haire for the remainder of 2019 to ensure a smooth transition. TCS represents that Engico said that it would not pay TCS a commission on the 2019 sale to Lawrence Paper. In

the end, TCS never received commission for the 2019 sale, but it continued to provide representation for Engico in North America.

Shortly after the meeting at Haire, TCS communicated to Engico that it had a North American buyer for a machine that Lawrence Paper wanted to send back to Engico. The buyer was Welch Packaging, whom TCS had previously introduced to Engico. TCS had developed the relationship with Welch for years on Engico's behalf and was finally ready to make the sale. But, even after repeated outreach to Engico to facilitate the sale, TCS could not push the sale through. That changed in January 2020. Haire, not TCS, sold the used machine to Welch—Haire's first sale as Engico's new representative in North America. TCS did not receive commission on this sale either.

Engico, on its own, sold one last machine in North America before TCS's representation ended on January 1, 2020. On October 30, 2019, Engico contracted to sell a machine to President Container. Engico argues, and TCS does not dispute, that TCS was not involved in this sale and did not recruit President Container as a customer. TCS responds that the sale occurred in its territory and while TCS was Engico's representative so, consistent with the parties' agreement in Charlotte, TCS should receive a commission. TCS did not receive a commission.

January 2020 marked the end of the parties' relationship. That same month, TCS sued Engico. TCS claimed Engico breached the parties' agreement when it refused to pay TCS commissions on (1) the May 2019 sale to Lawrence Paper Company, (2) the October 2019 sale to President Container, and (3) the January 2020 sale to Welch Packaging. TCS also

included state law claims for an accounting, unjust enrichment, and violation of the Illinois Sales Representative Act. The parties cross-moved for summary judgment. In response to TCS's motion, Engico argued that the 2004 oral agreement was not enforceable because the essential terms were not definite, and the 2018 agreement reached in Charlotte was barred by the Statute of Frauds.

The district court granted partial summary judgment to TCS with respect to the commission Engico owed on the 2019 sale to Lawrence Paper. The court found that the 2004 oral agreement was valid because the terms were sufficiently definite. In particular, the court found that (1) TCS and Engico agreed that TCS would procure customers for Engico; (2) the sales territory was North America; (3) Engico originally agreed to pay TCS an 8% commission, which was later modified to a sliding scale, for sales in which TCS was involved; and (4) the duration was unspecified, which, under Illinois law, created a contract that was terminable at will by either party. The court left the remaining claims (the 2019 sale to President Container, the 2020 sale to Welch Packaging, and the state law claims) to the jury.

At trial, the district court informed the jury that the court had already found an enforceable oral contract between TCS and Engico. But the Court also instructed the jury that, to prevail on its breach of contract claims for the two remaining commissions, TCS was required to prove: (1) the terms of the contract between the parties; (2) performance by TCS of its obligations under the contract; (3) Engico's failure to perform its obligations under the contract; and (4) resulting damage to TCS.

The jury found Engico liable for breach of contract for failing to pay commissions for the two sales. The jury awarded TCS damages consistent with the sliding scale arrangement for those two sales, and exemplary damages for all three unpaid commissions. Engico appeals only the district court's grant of partial summary judgment, so we say no more about the jury trial.

## II

We review a district court's grant of summary judgment de novo. *Foster v. PNC Bank, Nat'l Ass'n,* 52 F.4th 315, 320 (7th Cir. 2022). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also, Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). At the summary judgment stage, we construe the record and all reasonable inferences that may be drawn from it in the light most favorable to the nonmoving party. *Weaver v. Speedway, LLC,* 28 F.4th 816, 820 (7th Cir. 2022).

Where, as here, our subject matter jurisdiction is premised on diversity of citizenship, "state law applies to substantive issues." *Skyrise Constr. Grp., LLC v. Annex Constr., LLC,* 956 F.3d 950, 956 (7th Cir. 2020).

## A

Engico first argues that the 2004 agreement did not contain definite and certain terms about the applicable commission rate, the exclusivity of the agreement, the identity of the specific entity that was entitled to receive commissions, the duration of the agreement, the grounds for terminating the agreement, or the availability of post termination

commissions. Without these terms, Engico argues, the agreement was invalid and unenforceable. We are unpersuaded.

In Illinois, "[a] contract 'is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do.'" *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machs. Corp.*, 547 F.3d 882, 888 (7th Cir. 2008) (quoting *Acad. Chi. Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991)). "A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Acad. Chi. Publishers*, 578 N.E.2d at 984.

Illinois courts have found that "[t]he essential terms of a sales representative [agreement] include the commission structure, the territory, the services to be performed, the duration of the agreement and/or a termination provision." *Anderson v. Fel-Pro Chem. Prod., L.P.*, No. 95C4604, 1996 WL 33410082, at *6 (N.D. Ill. Dec. 19, 1996) (citing *O'Neil & Santa Claus, Ltd. v. Xtra Value Imports, Inc.*, 365 N.E.2d 316, 318 (Ill. App. Ct. 3rd Dist. 1977)). Our task is to discern whether these essential terms were provided for in the oral agreement between Engico and TCS. We conclude they were.

*Commission structure.* Engico argues that the parties did not agree on a set commission structure, only that a commission would be paid on a case-by-case basis. The record evidence directly contradicts this position. At Benzoni's deposition on May 15, 2021, he testified that the parties had reached a "gentlemen's agreement" that provided that TCS "would get commissioned [] at eight percent less the cost of

transporting the products." Engico's expert, Lance Head, also testified that the parties' original agreement was "for an 8 percent commission of all products sold in North America." Benzoni's and Head's shared understanding of the parties' initial commission structure was confirmed by contemporaneous practice when Engico paid TCS an 8% commission on the 2005 sale to Lawrence Paper.

Similarly, Benzoni's own declarations establish that in February 2011 the parties agreed that "future commissions would have to be on a sliding scale" and that the scale would be "six percent (6%) for the first million, five percent (5%) for the next million, four percent (4%) for the next million, and three percent (3%) on any further amounts." The parties' subsequent dealings confirm this agreement, too: Engico paid TCS the sliding scale commission on its sale to JayHawk Boxes in 2017. Thus, we conclude that the commission structure term was sufficiently certain and definite.

*Territory & Services*. Engico does not dispute the territory and services terms, nor could it. When asked about the terms of the verbal agreement with TCS at that 2021 deposition Benzoni testified that "TCS was supposed to look for opportunities to sell the Engico technology on the North – in the North American market."

*Duration & Termination*. Engico next contends that the district court erred in granting summary judgment on TCS's contract claim because the parties never agreed to the contract's duration or grounds for termination. That argument is also without merit. True, the parties did not explicitly agree at the outset on the duration of their relationship, but that is of little moment when, in Illinois, contracts of indefinite duration are presumptively terminable "at the will of the parties." *Jespersen*

*v. Minn. Mining & Mfg. Co.*, 700 N.E.2d 1014, 1015 (Ill. 1998). That means that either TCS or Engico "could terminate the agreement for any reason or no reason without committing a breach of contract." *Id*. at 1017. Where state law provides the default rule, a contract term is not unenforceable for indefiniteness. *See Bruzas v. Richardson*, 945 N.E.2d 1208, 1215 (Ill. App. Ct. 3rd Dist. 2011) (holding that a contract is not indefinite if the court can fill in the gaps through "proper rules of construction and applicable principles of equity").

Because Illinois law provides the duration term, we need not address Engico's additional argument about the lack of a termination clause. Illinois courts have held that a sales representative agreement must have either a durational clause *or* a termination clause but need not have both. *See Anderson*, 1996 WL 33410082, at *6. Thus, we conclude that this material term, too, was satisfied.

Failing to persuade on any of those essential terms, Engico invites us to consider other terms that Engico deems essential. Specifically, Engico contends that because its agreement with TCS lacked an exclusivity term and terms providing for the identities of the parties and the calculation of post-termination commissions, the agreement was not sufficiently definite. But Engico fails to identify any Illinois cases deeming Engico's proffered terms essential to a sales representative agreement. We decline Engico's invitation to create new law for Illinois. *See Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1093 (7th Cir. 1999) (noting that federal courts have no power to create state law).

**B**

Engico next argues that the district court erred in rejecting its claim that the 2018 oral agreement was unenforceable under the Statute of Frauds. We agree with the district court that the Statute of Frauds does not apply, but we take a different route to that conclusion.

Under the Illinois Statute of Frauds, "[n]o action shall be brought … upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith or some other person thereunto by him lawfully authorized." 740 ILL. COMP. STAT. 80/1 (West 2010). In Illinois, "[a] writing has been considered 'signed' for the purpose of the statute of frauds even if it merely contains something which manifests that the instrument has been executed or adopted by the party to be charged with it." *Thompson v. Bebout*, 2011 IL App (5th) 110041-U, ¶ 18 (citing *Just Pants v. Wagner*, 617 N.E.2d 246, 251 (Ill. App. Ct. 1st Dist. 1993)).

The definition of "writing" has also been liberally construed. For example, following the lead of Illinois courts, we have held that a party's deposition may satisfy the Statute of Frauds' writing requirement if it contains the agreement's essential terms. *See Bower v. Jones*, 978 F.2d 1004, 1009 (7th Cir. 1992) ("A deposition may qualify as a signed writing for statute of frauds purposes."); *cf. URSA Farmers Coop. Co. v. Trent*, 374 N.E.2d 1123, 1124–25 (Ill. App. Ct. 4th Dist. 1978) (holding that a deposition can satisfy the writing requirement under the UCC Statute of Frauds).

In this case, Benzoni's deposition satisfies the Statute of Frauds' writing requirement. As we explained above, Benzoni's deposition testimony admitted the contract's existence and its essential terms. Consequently, the Statute of Frauds does not bar enforcement of the parties' oral agreement.

For these reasons, we AFFIRM the judgment of the district court.